UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


MERCHANTS INSURANCE GROUP,      )
    Plaintiff,                  )
                                )
v.                              )      CIVIL ACTION
                                )      NO. 08-cv-12040-DPW
MR. CESSPOOL, LLC, CHUCK CO., LLC )
AND ROBERT CARROCA,             )
    Defendants.                 )
                                )


MEMORANDUM AND ORDER
July 19, 2010


    In December 2008, Plaintiff Merchants Insurance Group
("Merchants") brought this action against Mr. Cesspool, LLC
("Cesspool"), Chuck Co., LLC, and Roberto Carroca (collectively,
the "Defendants") for a declaratory judgment voiding *ab initio* a
commercial insurance package policy issued to Cesspool.  Alleging
the policy application contained material misrepresentations by
Cesspool regarding the nature and scope of its business
operations and corporate structure, Merchants argues it has no
duty to defend or indemnify Cesspool in an underlying personal
injury action and seeks rescission of the policy.  Merchants now
moves for summary judgment.

# I. BACKGROUND[1]

## A. The Negotiation of the Insurance Policy

Brad Lowe, the owner of Southeastern Insurance Agency ("Southeastern"), helped obtain insurance coverage from Merchants for Charles Leonard, the owner of Cesspool, a company engaged in septic pumping, port-a-john rentals, and liquid hauling.  When Lowe and Leonard first encountered each other at a country club, Lowe bet Leonard that he could save him money on insurance.

Sometime thereafter, Lowe met Leonard at the Cesspool office in Acushnet, Massachusetts on two occasions.  At the initial meeting, Lowe sought to obtain information for purposes of providing Leonard an insurance quote; to that end, Lowe took copies of Cesspool's current insurance policies to guide his proposal for insurance coverage.

The Defendants maintain that Lowe also was given the policies from Chuck Co., a steel fabrication and construction business that would be discontinued at the end of 2004 or beginning of 2005.  Leonard says he informed Lowe that Cesspool was handling Chuck Co.'s business while it was winding down, and

---

[1] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, Carroca submitted a concise statement of the material facts in accordance with Local Rule 56.1.  Defendants Cesspool and Chuck Co. included a numbered list of facts in their opposition memorandum.  Accordingly, I draw the factual background from Carroca's statement of facts, as refined by the Opposition filed by Cesspool and Chuck Co.

that he wanted the same kind of insurance coverage that had previously covered Chuck Co.  Lowe testified that he understood Leonard wanted the same or better coverage than that received from his current insurers, but Lowe disputes that he saw a policy for Chuck Co.

Lowe knew, the Defendants argue, that Chuck Co. had been insured for its steel work.[2]  Leonard testified he told Lowe that, due to the overlap while Chuck Co. was winding down, he "needed the same coverage because there was an overlap period there where I was phasing that out."  During that period, Leonard explained to Lowe, Cesspool would be servicing machinery and doing steelwork.[3]  Leonard reportedly took Lowe on a tour of the steel facility and showed him the machine, the press, and tons of steel.  Lowe, by contrast, states that Leonard only reviewed "what he was doing in business at the time.  And he was doing the port-a-johnnies, which he went into in detail, including that he assembled 'em.  He went into the pump-outs, both septic and the port-a-johnnies; and he went into the gray matter of the fluids."

---

[2] The Defendants also contend that Southeastern was made aware, in the context of issuing workers compensation coverage to Cesspool, that Cesspool employees were performing machinery-related work during that overlap period.  Leonard, however, testified that Cesspool dealt with someone other than Lowe at Southeastern for this coverage.

[3] Leonard's testimony about his disclosures to Southeastern is inconsistent.  I observe, *infra*, that Leonard also testified about his failure to tell Lowe that Cesspool did construction and serviced and installed machinery.

After the initial visit, Lowe returned to Cesspool's office on a second occasion to bring Leonard the policy application (the "Application") that had been completed by a licensed insurance broker at Southeastern.  Lowe contends that he and Leonard "went through the whole application" and that he asked Leonard "to read [the questions] and verify that the correct answers are there" before Leonard signed the Application. Lowe admits he never specifically asked Leonard if he did any work related to servicing or installing machinery.  Leonard, for his part, claims that he signed the application without reading it and gave Lowe a $2,000 check.  The Application was executed by Leonard on June 21, 2005.

It is undisputed that the Application contained several errors.  First, the "nature of business/description of operations by premise(s)" only stated that "[t]his insured pumps out septic systems and also rents out port-a-jons."  The question "Does applicant install, service or demonstrate products?" was answered "No."  The Application also asked whether "any operations [were] sold, acquired or discontinued in [the] last 5 years," and the answer listed was "No."  Leonard testified that Chuck Co. was, in fact, discontinued within the five years preceding the Application and that the answer should have been marked "Yes." Finally, the Application incorrectly stated that the business was started in 1978 – when Leonard was only ten years old.

Merchants contends that it conducted an investigation of Cesspool's business operations in order to verify the accuracy of the information contained in the Application and to assess the risk being insured.[4]  Jonathan Wilson, a risk control representative for Merchants, was assigned by the underwriter to perform Loss Control Evaluations on Cesspool to determine whether Cesspool was correctly classified and operated its business within the classification of its insurance policy.  As part of that investigation, Wilson conducted a survey of Cesspool's operations on August 10, 2005, during which he toured the entire premises.  Wilson, however, states that he does not remember "the inspection of the actual building."  As a matter of practice, at every site inspection, Wilson generally took photos of the facility, interior, exterior, and job site that he then submitted to the underwriter as part of his evaluation.  However, Wilson maintains that while he took those photographs for the Cesspool inspection, he thereafter deleted them from his computer; the copies provided to the underwriter are missing.  Additionally, Wilson testified that he was never told that Cesspool was operating Chuck Co. concurrently, and if he had that information, he would have written it in his report.  Wilson's report

---

[4] As part of this investigation, Southeastern reviewed and analyzed a Dun & Bradstreet Business Information Report for Cesspool, which described Cesspool's operations as "provides septic tank cleaning services, repair and installation."

describes "jobs currently in progress" as "residential septic tanlkpumping [sic] within a 50 mile radius."  It also states that Cesspool's "[s]ervice involves the pumping of residential septic tanks; the insured performs no installation/removal of septic systems/tanks."

Merchants issued a commercial package for insurance, No. CMP9145835, to Cesspool, effective from July 7, 2005 through July 7, 2006 (the "Policy").  The Account Underwriting Documentation and the Commercial Insurance Application both describe Cesspool's business operation as septic systems cleaning and portable toilet rentals.

B. Personal Injury Lawsuit

In November 2007, Roberto Carroca filed a complaint against Chuck Co. for personal injuries he sustained during a September 9, 2005 workplace incident in which Carroca's arms were pulled into an unguarded conveyor belt.  See Carroca v. Chuck Co., No. BRCV2007-1600 (Mass. Super. Ct. filed Nov. 9, 2007).  Carroca alleged that Chuck Co. "marketed, provided instructions and warnings for, and/or distributed, sold, installed or otherwise transferred and/or assembled" the conveyor belt used by his employer, Parallel Products of New England.  Merchants denied coverage of the claim on the grounds that Cesspool, the insured, was not named as a defendant.  In September 2008, Carroca amended his complaint to include Cesspool as a defendant.  Merchants

subsequently sent Cesspool a reservation of rights letter, appointing counsel to defend Cesspool against Carroca's law suit, but reserving its right to deny coverage.  That letter stated that "Merchants was not informed that Mr. Cesspool was in the business of maintaining industrial equipment . . . . [I]f this had been disclosed to us, Merchants would not have issued the policy to Mr. Cesspool."

Leonard testified that Cesspool began doing work for Parallel Products at the end of 2003.  The tasks performed by Cesspool employees for Parallel Products included: (1) digging an electrical trench and performing excavation work; (2) installing conveyor belts and general steel work; (3) welding and rigging work on conveyor belts; (4) servicing a "glass trammel," i.e. a circular screen that breaks material apart and separates it; (5) fixing fences, cutting grass, and other general labor; (6) building a removal ramp; (7) installing a new glass line to separate colored glass; and (8) performing work on commercial machinery.[5]

Leonard stated numerous times on the record that he neither disclosed to Southeastern or its agents, nor included on the Application, that Cesspool performed this kind of work.  He also conceded that he should have disclosed this information.  In

---

[5] The tasks described above are reflected in a series of invoices from Cesspool to Parallel Products between May 2004 and June 2005.

fact, Cesspool actually billed Parallel Products for general
labor on June 13, 2005, approximately a week before Leonard
executed the Application on June 21, 2005.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
the movant is entitled to judgment as a matter of law."
*Lockridge v. Univ. of Maine Sys.*, 597 F.3d 464, 469 (1st Cir.
2010) (quoting FED. R. CIV. P. 56(c)).  A fact is "material" if it
"might affect the outcome of the suit under governing law."  *Id.*
at 469 n.3 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248 (1986)).  An issue is "'genuine' only 'if a reasonable
jury could resolve it in favor of either party.'"  *Id.* (quoting
*Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).

## III. DISCUSSION

### A. Merchants' Agents

As a threshold matter, I must determine whether Southeastern
and Lowe acted as Merchants' agents in their interactions with
Cesspool.  On the first page of the Application, Southeastern is
listed as the "Producer" of Merchants' Policy.  Under
Massachusetts law,[6] "[a]n insurance producer shall not act as an

---

[6] When, in a diversity case such as this, "[a]ll parties
cite to Massachusetts case law to support their claims . . .

agent of an insurer unless the insurance producer becomes an appointed agent of that insurer." MASS. GEN. LAWS ch. 175 § 162S(a).  A certified record of the Massachusetts Division of Insurance ("DOI") identifies Southeastern as a licensed producer since 1998, and indicates that Southeastern has an appointment as agent from Merchants from February 2004 through June 2010. Additionally, the DOI website states that Southeastern has a "Company Appointment" by Merchants and names Lowe as Southeastern's "Business Entity Member."  *See* Massachusetts Division of Insurance: Information Portal for Consumers, Agent Profile Page for Southeastern Insurance Agency Inc., http://agentfinder.doi.state.ma.us/AgentSearch.aspx (search "Agency Name" for "Southeastern Insurance Agency Inc."; then follow "Southeastern Insurance Agency Inc" hyperlink) (last visited July 16, 2010).  A "Company Appointment" is defined as "[a]n appointment by an insurance company of an agent/agency to sell, solicit, or negotiate on behalf of the insurance company." Massachusetts Division of Insurance: Information Portal for Consumers, Company Appointment, http://agentfinder.doi.state.ma.us/Help/Company_Appointment.htm (last visited July 16, 2010).  I therefore conclude that based

---

[t]his Court need inquire no further into choice of law." *Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co.*, 623 F. Supp. 2d 98, 106 (D. Mass. 2009).

upon the record before me, Southeastern and Lowe are Merchants'
agents for purposes of their interactions with Cesspool.

### B. Material Misrepresentation

Merchants seeks to rescind the Policy for material
misrepresentations made by Cesspool on its Application.  Under
Massachusetts law,

> [n]o oral or written misrepresentation . . . made in the
> negotiation of a policy of insurance by the insured . . .
> shall be deemed material or defeat or avoid the policy or
> prevent its attaching unless such misrepresentation . . . is
> made with actual intent to deceive, or unless the matter
> misrepresented . . . increased the risk of loss.

MASS. GEN. LAWS ch. 175 § 186(a).  "Negotiation," for purposes of §
186, "encompasses not only the application but the entirety of
the transaction leading to the issuance of the policy." *Hejinian
v. Gen. Am. Life Ins. Co.*, No. 05-3851-BLS1, 2009 WL 981732, at
*3 (Mass. Super. Ct. Jan. 13, 2009) (citing *Everson v. Gen. Fire
& Life Assur. Corp.*, 88 N.E. 658, 660 (Mass. 1909) (defining
"negotiation," in this context, as "the entire transaction of
applying for and finally issuing the completed contract of
insurance")).  A material misrepresentation in an insurance
application, "measured by an objective standard, is one which
would 'naturally influence the judgment of [an] underwriter in
making the contract at all, or in estimating the degree and
character of the risk, or in fixing the rate of the premium.'"
*A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 838 N.E.2d
1237, 1246 (Mass. 2005) (quoting *Employers' Liab. Assur. Corp. v.*

*Vella*, 321 N.E.2d 910, 913 (1975) (alteration in original)).

Merchants does not expressly state that Cesspool acted with deceitful intent, but instead argues that Cesspool's misrepresentation increased Merchants' risk of loss.  I evaluate whether Cesspool made misrepresentations and, if so, whether those misrepresentations were material, i.e. increased the risk of loss.  *See* MASS. GEN. LAWS ch. 175 § 186(a).

1. Misrepresentation

At the outset, I recognize the fundamental proposition that the insured or applicant for insurance owes a "substantial degree of good faith" to the insurer, including a "good faith obligation to alert the agents" to false representations on the application. *Sullivan v. Manhattan Life Ins. Co. of N.Y.*, 626 F.2d 1080, 1082 (1st Cir. 1980).  The insured cannot "deliberately, knowingly, or recklessly . . . leave entirely to the soliciting insurance agents the burden of affirmatively inquiring whether an express representation . . . to which the applicant has appended his signature, is false or in need of explanation or modification"; this obligation is particularly applicable if the insured has "some general knowledge of the insurance forms."  *Id.*

(a) Leonard's Failure to Read the Application

Relevant case law is not forgiving of persons like Leonard, the owner of two businesses, who contends that he did not read an Application with patent misrepresentations.  The First Circuit

-11-

has held that failure to read the application is no excuse where there is "no suggestion that [the insured] could not read English, or was prevented from reading what was immediately above his signature . . . [or] it was part of the contract delivered to him and which he accepted." *Warren v. Confederation Life Ass'n*, 401 F.2d 487, 490 (1st Cir. 1968); *cf. Loguidice v. Metro. Life Ins. Co*, 336 F.3d 1, 7 (1st Cir. 2003) (concluding there is "no reason to expect that the Massachusetts courts would forgive [plaintiff's] failure to read through her folder" of policy information from the insurance representative).

Had Leonard simply glanced at the first page of the Application, the very page he signed, he would have noticed two glaring errors: that the business was started when he was only ten years old, and the business description only mentioned pumping septic systems and renting portable toilets. *Cf. John Hancock Mut. Life. Ins. Co. v. Schwarzer*, 237 N.E.2d 50, 53 (Mass. 1968) (applying estoppel where insured would not have realized the defect even if she had read the application). Leonard had a good faith obligation to alert Lowe about those errors. *See Manhattan Life*, 626 F.2d at 1082. Cesspool and Chuck Co. cannot rely on Leonard's purported failure to read the Application to shield them from his misrepresentations and

failure to correct them.[7]

>    *(b)   Equitable Estoppel*

Southeastern, Merchants' agent, completed the Application based on oral answers that Leonard provided Lowe during their first meeting.  Massachusetts law recognizes that "when the applicant gives correct oral answers which are incorrectly recorded by an authorized agent . . . the insurer cannot rely on the falsity of such answers to avoid the policy."  *Schwarzer*, 237 N.E.2d at 52 (citing *Sullivan v. John Hancock Mut. Life Ins. Co.*, 174 N.E.2d 771 (Mass. 1961)); *see also Manhattan Life*, 626 F.2d at 1083 ("The core of *Sullivan* and its successors [like *Schwarzer*] is that the finder of the facts must conclude that the insured gave the [insurer's agent] correct oral answers to the questions and that they were wrongly recorded.").  Where an

---

[7] Defendants' Cesspool and Chuck Co. argue that Merchants had a duty to ensure Cesspool had adequate insurance coverage and that Leonard relied on Lowe to provide appropriate coverage.  Although "there is no general duty of an insurance agent to ensure that the insurance policies procured by him provide coverage that is adequate for the needs of the insured . . . in an action against the agent for negligence, the insured may show that special circumstances . . . gave rise to [that] duty . . . ."  *GE HFS Holdings, Inc. v. Nat'l Union Fire Ins. Co.*, 520 F. Supp. 2d 231, 237 (D. Mass. 2007) (quoting *Martinonis v. Utica Nat'l Ins. Group*, 840 N.E.2d 994, 996 (Mass. App. Ct. 2006)).  Special circumstances include a long-standing relationship between the insured and insurer, the insured's reliance on the agent's review of the adequacy of the insurance, and the agent's specific assurances on past occasions and in the case at bar.  *Martinonis*, 840 N.E.2d at 996.

Significantly, Merchants' lawsuit does not arise from a negligence claim against its agent.  Nor is there evidence that any of these special circumstances are present such as to merit departure from the general rule.

insurer seeks to avoid a policy on the basis of its agent's false statements, the Supreme Judicial Court of Massachusetts ("SJC") has held that the "'well established principle . . . that the acceptance of a contract establishes all its terms' will give way 'where the elements of equitable estoppel are present.'" *Fay v. Aetna Life Ins. & Annuity Co.*, 307 F. Supp. 2d 284, 292 n.22 (D. Mass. 2004) (quoting *Schwarzer*, 237 N.E.2d at 52).

Depending on the particular conduct that triggers the equitable estoppel rule, the insured may be excused from its duty to read the policy. *Schwarzer*, 237 N.E.2d at 53.  But *Schwarzer* does not adopt a general proposition that "the law does not impose a duty on an insured to read a policy"; rather the "equitable estoppel rule applies *only* when an insurer attempts to escape the obligations of its policy on the basis of errors for which *it (or its agent)* is *solely* responsible."  *Fay*, 307 F. Supp. 2d at 292 n.22 (emphasis added).  For example, where the insured "would not necessarily have been informed of a defect" even if he "had read the application with the policy," the SJC has held that the insurer could not void the policy.  *Schwarzer*, 237 N.E.2d at 53.

In *Schwarzer*, for example, "an agent made knowingly false entries on an insurance application that was never shown to the insured."  *Fay*, 307 F. Supp. 2d at 292 n.22.  The agent had "asserted, in effect, [to Lorene Schwarzer] that she had done all that was necessary to enable the company to issue her a valid

-14-

policy and that the company had done so." *Schwarzer*, 257 N.E.2d at 53.  By contrast, an applicant of "intelligence and experience" with insurance cannot leave the burden of assuring accuracy to a soliciting insurance agent when the applicant has signed an application that is false.  *Manhattan Life*, 626 F.2d at 1082.

> *(c)  Applying Legal Principles*

The three misrepresentations in the Application that Merchants attributes to Cesspool are: that (1) the nature of Cesspool's business was limited to pumping out septic systems and renting out port-a-johns; (2) Cesspool did not install, service or demonstrate products; and (3) Cesspool did not sell, acquire, or discontinue any operations in the last five years.  The Application does not reflect that Cesspool performed steelwork, construction, and serviced machinery both before and after the inception of the Policy, or reflect Cesspool's relationship to Chuck Co. at the time the Application was executed.

Analysis of Merchants' right to rescind the Policy begins with inquiry regarding who is responsible for the misrepresentations in the Application: Cesspool or Southeastern or both.  Viewing the record in the light most favorable to the Defendants, I examine whether Leonard's oral representations to Lowe were truthful.  The parties dispute whether Leonard told Lowe that: Cesspool was handling Chuck Co.'s business during the

winding down period, Chuck Co. was previously insured for construction and steel work, and Cesspool wanted the same type of coverage Chuck Co. had had previously.

The Defendants maintain that Leonard accurately informed Lowe about the nature of Cesspool's business and its relationship with Chuck Co.  Leonard testified that he told Lowe that Chuck Co. did "anything with steel," including "steelwork, fabrication, installation" and servicing machinery.  But Leonard also repeatedly admitted throughout his testimony that he should have but failed to inform Lowe that Cesspool did general labor, construction, and installed and serviced commercial machinery (including conveyor belts) for clients like Parallel Products. At the summary judgment phase, I must accept Leonard's testimony that he told Lowe that Cesspool needed coverage for "anything with steel" during the short overlap period.  This vague reference is arguably negated by Leonard's repeated admissions that he failed to tell Lowe about specific tasks Cesspool was performing for its clients at the time the Policy was issued. Nevertheless, this statement is sufficient, albeit barely so, to prevent determination as a matter of law that Cesspool intentionally failed to disclose relevant risks in the negotiations preceding the execution of the Application.  There is a genuine issue of material fact on that issue.[8]

---

[8]  There is disagreement as to whether Leonard provided Lowe with Chuck Co.'s prior insurance policies or only Cesspool's, and

Because I cannot say, as a matter of law, on this summary judgment record that Merchants did not bear some responsibility for the recording of the underlying misrepresentations in the Application, the applicability of equitable estoppel must be addressed. *See Fay*, 307 F. Supp. 2d at 292 n.22.  At the outset of this discussion, I note the factual disputes regarding whether Leonard signed the Application without reading it and whether he read the whole Application through to verify its accuracy.

The failure of an insured to read the Application is not sufficient to establish the defense of equitable estoppel.  Here, the applicant Leonard was a businessman of experience with an awareness of his insurance policies.  He was shown the Application, but in the light most favorable to the Defendants, simply neglected to read it when it was tendered to him.  I find as a matter of law that equitable estoppel is not available to the Defendants to avoid the consequences that flow from Leonard's admitted execution of an Application containing false representations.

2. <u>Materiality</u>

Having concluded that equitable estoppel is not available as

---

whether Lowe and Wilson separately toured the steel shop on Cesspool's premises.  I note that Wilson's customary photographs of his site visit to Cesspool would have provided tangible evidence as to whether Southeastern knew about Cesspool's steel business.  Those photographs are now missing from the underwriter's file so this evidence is unavailable.

a defense to Cesspool for the misrepresentations in the
Application which it signed, I now address whether those
misrepresentations are material.  Materiality "depends on what a
reasonable underwriter would have done differently had she known
the truth behind the misrepresentation." *Fed. Ins. Co. v. HPSC,
Inc.*, 480 F.3d 26, 34 (1st Cir. 2007).  What an underwriter
objectively would do in a given situation can be proved in a
variety of ways, including (1) "the testimony of various
underwriters or other risk management experts as to what they
would have done in the same situation," (2) "evidence of what
underwriters have in fact done in the past in similar
situations," or (3) "an insurer might wish to establish what it
would do in a particular situation by presenting evidence of its
own policies and past practices."  *Id.*

In support of its argument that Cesspool's
misrepresentations were material, Merchants submits its
"Underwriting Guide" from 2005 and an affidavit from June
Mittelmark, a commercial lines underwriting supervisor for
Merchants with approximately thirty years of experience in the
underwriting industry.  The Defendants offer no evidence or
arguments to refute the materiality of the misrepresentations or
rebut Merchants' contentions.

Mittelmark explains that, had Merchants known Cesspool
performed commercial services for its clients, Merchants would

have had to issue a policy using specific "hazard class codes."
The applicable codes relating to the installation, servicing or
repair of machinery or equipment and refuse collection are rated
hazard grade nine out of ten.  According to Mittelmark,
Merchants' approval of hazard nine accounts is "exceedingly
rare," due to the high hazard and severity associated with those
accounts, which increase Merchants' risk of loss.  She states
that an increase in risk is "material to the decision by
Merchants to issue a policy and the terms of such a policy."
Merchants deems the installation and servicing of hazardous
commercial machinery – activities performed by Cesspool for
Parallel Products – to have "a high risk exposure and a high
potential for defense costs," and accordingly does not consider
such accounts "suitable for underwriting by Merchants."
Mittelmark also explains that in "the unlikely event" Merchants
chose to underwrite such a policy for Cesspool, the premium rate
would have been at least 20% greater than what Cesspool was
actually charged to embody the increased risk.

Mittelmark's contentions accord with the 2005 Underwriting
Guide.  Merchants' initial steps for underwriting an account are
to identify hazards and to evaluate losses and loss severity.  As
a general rule, Merchants avoids writing risks with "an excess of
severity exposures" and charges premiums large enough to absorb
expected losses.  For Commercial Package Policies, such as the

one issued to Cesspool, "[r]isks written in [Merchants] should have a **preponderance** of low hazard characteristics," and "[r]isks with the high hazard characteristics" – i.e. "uncontrolled hazards" or "moderate to high potential for frequency, severity or defense costs" – "should not be considered." (emphasis in original).

Citing its 2005 Underwriting Guide and Mittelmark's affidavit, Merchants contends that had the Application disclosed Cesspool was winding down the operation of Chuck Co., a company that constructed, serviced and installed industrial machinery, Merchants would have either declined to issue the Policy to Cesspool, or charged a much higher premium, because of the associated hazards with those services.  That Mittelmark's affidavit and the Underwriting Guide are uncontroverted means "no issue of fact was presented as to whether [Cesspool's] misrepresentation increased the risk of loss." *TIG Ins. Co. v. Blacker*, 767 N.E.2d 598, 602 (Mass. App. Ct. 2002).  Based on these uncontested facts, I conclude that the misrepresentations in the Application were "material" such that a reasonable underwriter would have acted differently if Cesspool had not misrepresented the nature of its business and relationship to Chuck Co.  *HPSC, Inc.*, 480 F.3d at 34.  Specifically, Merchants never would have written Cesspool's current Policy, or alternatively, would have fixed a different premium rate had

Cesspool not signed the Application containing misrepresentation. *A.W. Chesterton Co.*, 838 N.E.2d at 1246.  Such material misrepresentations entitle Merchants to rescind the Policy under Massachusetts law.  *HPSC, Inc.,* 480 F.3d at 33 (citing MASS. GEN. LAWS ch. 175 § 186).

### IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Plaintiff's motion (Doc. No. 20) for summary judgment.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE